UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CHERYL L. KING,

               Plaintiff,

         Case No. 3:13-cv-01457-ST

    v.

         FINDINGS AND

COMMISSIONER OF THE SOCIAL       RECOMMENDATION
SECURITY ADMINISTRATION,

              Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Cheryl L. King ("King"), seeks judicial review of the final decision by the

Social Security Commissioner ("Commissioner") denying her applications for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC

§§ 401-433, and Supplemental Security Income ("SSI") under Title XVI of the SSA,

42 USC §§ 1381-1383f.  This court has jurisdiction to review the Commissioner's decision

pursuant to 42 USC § 405(g) and § 1383(c)(3).  For the reasons set forth below, that

decision should be REVERSED and REMANDED for further proceedings.

1 - FINDINGS AND RECOMMENDATION

## ADMINISTRATIVE HISTORY

King previously filed for DIB and SSI on June 30, 1999, alleging a disability onset date of May 20, 1999, based on carpal tunnel syndrome, a staph infection wound on her right thigh, and numb legs and feet.  Tr. 84, 231.[1]  On October 26, 2000, a hearing was held before Administrative Law Judge ("ALJ") Bert C. Hoffman, Jr., who issued a decision on January 27, 2001, finding King not disabled.  Tr. 84-87.

King protectively filed again for DIB and SSI on June 10, 2009, alleging a disability onset date of January 18, 2001.  Tr. 201-10.  Her applications were denied initially and on reconsideration.  Tr. 88, 100, 112, 118.  On June 21, 2011, a hearing was held before ALJ Sharon L. Madsen in Fresno, California, at which King and a Vocational Expert ("VE") testified.  Tr. 27-80.  The ALJ issued a decision on September 23, 2011, finding King not disabled.  Tr. 8-21.  The Appeals Council denied a request for review on June 25, 2013.  Tr. 1-3.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR §§ 404.981, 416.1481, 422.210.

## BACKGROUND

Born in 1961, King was 50 years old at the time of the hearing.  Tr. 34.  She did not complete high school, but has taken professional development courses, and has past relevant work experience as a store clerk and a collections clerk.  Tr. 39, 238, 241-43.  King alleges that she is unable to work due to the combined impairments of carpal tunnel syndrome, cervical disc degenerative disease, lumbar and right shoulder degenerative joint disease, chronic pain, obesity, depression, anxiety, and peripheral neuropathy.  Tr. 13, 100, 290, 293.

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on January 6, 2014 (docket # 12).

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999); 20 CFR §§ 404.1520, 416.920.

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her

impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id.*  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

The ALJ noted initially that King had presented "new and material evidence warranting a change" in the RFC assigned by ALJ Hoffman in January 27, 2001.  Tr. 11.  Because King met her burden to show a "changed circumstance," the ALJ did not apply the presumption of continuing non-disability.  *Id.*  The ALJ also found that King met the insured status requirements through March 31, 2001, her date last insured.  Tr. 13.

At step one of sequential analysis, the ALJ concluded that King has not engaged in substantial gainful activity since January 18, 2001.  Tr. 13.

At step two, the ALJ determined that King has the severe impairments of cervical degenerative disc disease, lumbar degenerative joint disease, history of bilateral carpal

tunnel syndrome, obesity, right shoulder degenerative joint disease, anxiety, depression, and peripheral neuropathy. *Id*.

At step three, the ALJ concluded that King does not have an impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 15. The ALJ found that King has the RFC to "lift and carry 20 pounds occasionally and 10 pounds frequently," can "sit, stand and walk for six hours in an 8-hour day," is able to "occasionally stoop, crouch, crawl, and climb ramps and stairs," but can only "perform simple routine tasks." Tr. 16. However, she "cannot climb ladders, ropes, or scaffolds, be around heights," or forcefully grasp repetitively. *Id*.

Based upon the testimony of the VE, the ALJ determined at step four that King's RFC precluded her from returning to her past relevant work. Tr. 19. However, at step five, the ALJ found that considering King's age, education, and RFC, she was capable of performing light, unskilled work as a ticket taker, cashier 2, and mail clerk. Tr. 20.

Accordingly, the ALJ determined that King was not disabled at any time through the date of the decision. Tr. 21.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481

F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir

2001).  Where the evidence is susceptible to more than one rational interpretation, the

Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn

from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), *quoting Batson*

*v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*,

504 F3d at 1035.

## FACTUAL AND MEDICAL BACKGROUND

On August 21, 2008, Miguel Medrano, M.D., treated King for right shoulder pain

that was "tolerable but severe at times."  Tr. 539-41.  King denied numbness, tingling, or

any loss of strength.  Tr. 541.  Dr. Medrano prescribed Tylenol and Ibuprofen.  *Id.*

On September 15, 2008, a CT scan of the cervical spine showed spondylosis "of C4

through C6 vertebral bodies," and "C5-C6 and C6-C7 discogenic disease."  Tr. 338.  The

next day, a CT scan of King's right shoulder showed "degenerative changes of the right

acromioclavicaular joint," but was otherwise unremarkable.  Tr. 351.

The next day, John R. Gavini, M.D., treated King for body aches and muscles

spasms.  Tr. 451-52.  Dr. Gavini opined that her symptoms were secondary to hypokalemia

(low potassium level in blood) and hypomagnesemia (low magnesium level), admitted King

to the hospital for two nights, and prescribed electrolytes and magnesium.  Tr. 449-52.

On September 23, 2008, Eric N. Sorenson, M.D., continued treating King's right

shoulder pain, prescribed Vicodin, ordered a CT scan, and referred her to Kenny T. Mai,

M.D.  Tr. 531, 533-39.

On November 4, 2008, King reported to Dr. Mai that she suffered shoulder pain of 5

on a 0-10 scale "off and on for many years now" and that she "delayed treatment simply

because she never had insurance." Tr. 453-54, 530.  On examination, King had "almost full passive range of motion of her shoulder," positive Hawkin's signs (indicative of shoulder impingement), "tenderness of the AC joint," and "some pain with resistance, abduction, and internal rotation." Tr. 454.  X-rays showed "AC joint arthritis." *Id.*  Because King is allergic to cortisone injections, Dr. Mai prescribed Motrin. *Id.*

On January 7, 2009, a CT scan of King's lumbosacral spine showed "no significant bilateral neural foramen narrowing or nerve impingement," "no broad-based disk bulge," and "no evidence of spongylolisthesis or spondylolysis." Tr. 314-15.

Between January 8 and 31, 2009, King sought treatment at the emergency room ("ER") for back pain and body twitching. Tr. 464-93.  Scott L. Bowen, M.D., diagnosed her with sciatica. Tr. 493.

Between January 8 and February 5, 2009, Dr. Sorenson continued to treat King for shoulder pain and numbness in her lower extremities and continued prescribing Vicodin. Tr. 495-501, 525-26.

On February 5, 2009, a motor nerve conduction study was normal with no evidence of "compression neuropathy polyneuropathy or ongoing Lumbar radiculopathy." Tr. 543.

From about February to March 2009, King was treated for a staph infection in her thigh. Tr. 598, 615-16, 618-24.

On April 16, 2009, a CT scan of the abdomen and pelvis revealed "[h]eavy facet disease . . . in the lower lumbar spine." Tr. 327-28.

On August 23, 2009, Gene Libunao, M.D., performed a comprehensive psychiatric evaluation. Tr. 558-63.  King explained she was filing for disability benefits because she "[c]an't feel [her] feet and legs" due to neuropathy since her surgeries in February and

March for staphylococcus infection.  Tr. 558.  King reported that she was not able to shop or clean, but sometimes cooks meals and can dress and bathe independently.  Tr. 560.  Her concentration was adequate, and she was persistent in answering questions.  *Id.*

Dr. Libunao diagnosed King with an anxiety disorder that would improve within 12 months with treatment.  Tr. 561.  He assessed King as not having the ability to "perform simple and repetitive tasks or detailed and complex tasks," "accept instructions from supervisors," "perform work activities on a consistent basis," or "maintain regular attendance."  Tr. 562.

On September 10, 2009, Fariba Vesali, M.D., performed a comprehensive orthopedic evaluation.  Tr. 833-37.  King chiefly complained about decreased sensation and pain in her feet and reported using a wheeled walker since February 2009.  Tr. 833-34.  Dr. Vesali observed that King "had no difficulty getting on or off the exam table . . . [or] taking shoes off or putting them back on . . . [or] maneuvering in the exam room."  Tr. 834.  On the sensory exam, Dr. Vesali found "[d]ecreased light touch [in the] entire right upper extremity and dysesthesia of both feet, [and] tingling below the right knee," but the "pinprick exam of [the] feet . . . did not show any pain expression and [King] was not complaining of pain."  Tr. 836.  Dr. Vesali diagnosed King with chronic foot pain, but opined that she "should be able to stand and walk without limitations," "does not need an assistive device for ambulation," and "should be able to lift and carry without limitations."  *Id.*

On October 22, 2009, based on a review of the records, C. Fracchia, M.D., completed a Physical RFC Assessment and found King's "alleged functional limitations are not supported by objective findings."  Tr. 564-68.  He concluded that King could lift and carry 50 pounds occasionally and 25 pounds frequently, and could sit, stand, and walk for 6 hours in an 8-hour day.  Tr. 565-68.

8 - FINDINGS AND RECOMMENDATION

On October 26, 2009, based on a review of King's mental health records, Robert C. Scott, M.D., completed a Psychiatric Review Technique and determined that King suffered from anxiety disorder, but found "no evidence in [the] file of limitations specific to the . . . alleged anxiety." Tr. 569-82. He opined that her "[f]unctional limits available in the [medical record] appear to refer more to her physical limits than to any mental problem." Tr. 581.

On December 10, 2009, based on a review of King's mental health records, G. Ikawa, M.D., completed a Mental RFC Assessment and determined that King's anxiety was non-severe. Tr. 583-600. In support, Dr. Ikawa highlighted that King "was admitted in 9/08 for anxiety attacks," "is prescribed meds," "has no current professional" mental health treatment provider, "is able to care for her personal needs," and "has been able to sustain" substantial gainful employment. Tr. 599. Dr. Ikawa assessed King with moderate difficulty in maintaining concentration, persistence, and pace, and in understanding and carrying out detailed instructions; and a mild restriction in her daily living. Tr. 583, 594. As a result, he found King could "understand and remember work locations and procedures of a simply, routine nature involving 1-2 step job tasks and instructions," "maintain concentration and attention for above in 2 hour increments," and "sustain [full-time] work schedules on a sustained basis." Tr. 585.

That same day, based on his review of King's physical health records, Dr. Ikawa suggested adoption of ALJ Hoffman's formulation of a "medium RFC" based on "insufficient evidence to demonstrate a material change in circumstances from the ALJ decision to the DLI." Tr. 599. His explained that King:

> has degenerative disease of [the right] shoulder, [C-spine and lumbar spine]. She has [full range of motion, and normal] motor strength . . . .

> She uses a walker, but it was not prescribed and it is not medically
> indicated.  She has some decreased sensation in [her right upper
> extremity and] dysesthesia of both feet, but it does not impair her gait
> or ability to hold things.  She has been treated for cellulitis, but this
> does not impair her function.

*Id.*

On April 26, 2010, based on a review of the record, Paulette M. Harrar, M.D.,

M.P.H., found that "objective severity does not preclude" substantial gainful activity and

recommended affirming ALJ Hoffman's RFC for "medium" work "with some manipulative

restrictions."  Tr. 637-38.

Between May 12 and November 23, 2010, Dr. Sorenson continued to treat King for

back and bilateral leg pain.  Tr. 651-64.  On August 18, 2010, he diagnosed her with lumbar

spondylosis and neuropathy pain and ordered an MRI[2] of her lumbar spine.  Tr. 653.  On

November 23, 2010, he advised her to call "DAVE" regarding a "motorized wheelchair" or

"walker."  Tr. 651.

On September 11, 2010, King had difficulty breathing and a stabbing pain on her left

side, called 911, and was transported to the ER by ambulance.  Tr. 750-51.  Neelima Gondi,

M.D., assessed King as experiencing "another episode of panic attack based on [her]

description," her "history of anxiety disorder and panic attacks," negative lab results, and a

normal electrocardiogram ("EKG").  Tr. 757.

King was transported to the ER twice more in December 2010 for lower back pain.

Tr. 697-700 (December 22), Tr. 710-14 (December 19).

On December 28, 2010, Dr. Sorenson completed a Peripheral Neuropathy RFC

Questionnaire.  Tr. 644-48.  He opined that King has peripheral neuropathy and other

---

[2] The court could not locate the results of this MRI in the record.

impairments, a "poor" prognosis, and "severe" pain.  Tr. 644, 646.  He concluded that King could only walk less than one block; sit for 4 hours in an 8-hour workday; needed to shift positions at will and take unscheduled breaks every 15 minutes for 5 minutes; could lift less than 10 pounds occasionally and 10 pounds rarely; and required use of "a cane or other hand-held assistive device."  Tr. 645-46.  Dr. Sorenson also completed a Mental RFC Questionnaire, diagnosing King with Generalized Anxiety Disorder and Depression. Tr. 639.  He found her "[u]nable to meet competitive standards" in most mental abilities and aptitudes and "[s]eriously limited but not precluded" in carrying out very short and simple instructions, sustaining ordinary routine with special supervision, making simple work-related decisions, asking simple questions, and being aware of normal hazards.  Tr. 641.

On March 17, 2011, during another trip to the ER for left groin pain, an ultrasound of King's pelvis showed "[n]o definite abnormality."  Tr. 936.

On March 29, 2011, Dr. Sorenson completed a second Physical RFC Questionnaire, concluding that, similar to his December 28, 2010 Questionnaire, King could walk one block; sit, stand, and walk for less than 2 hours in an 8-hour workday; needed to shift positions at will and take unscheduled breaks hourly for 5-10 minutes; could lift 10 pounds occasionally and 20 pounds rarely; and required use of a "a cane or other hand-held assistive device."  Tr. 667-68.

On April 11, 2011, King called 911 complaining of radiating pain throughout her neck after a tooth extraction two days earlier.  Tr. 928.  Roger Bautista, M.D., ordered an MRI of King's spine that showed "C5-6 and C6-7 degenerative disk disease with anterior marginal osteophyte formation," and prescribed a foam collar.  Tr. 923, 932.

On May 2, 2011, King sought treatment at the ER for chest pain and chronic right shoulder pain. Tr. 881. Mark D. Hoffman, M.D., ordered a shoulder X-ray which showed "degenerative arthrosis of the acromioclavicular joint with mild inferior osseous spur formation," diagnosed non-cardiac chest pain, and prescribed Motrin. Tr. 875, 884-85.

On June 6, 2011, Dr. Sorenson ordered an MRI of King's spine which showed "[m]ild to moderate degenerative disc and joint changes visualized at the C4-5 and C5-6 levels . . . without cord impingement or signal abnormality. Neural foraminal narrowing is seen on the right greater than left at C5-6." Tr. 848-49, 951-52.

On August 1, 2011, Dr. Sorenson referred King to Jed Shay, M.D., for a pain consultation. Tr. 962. King explained that her overall pain had started ten years ago; affects her neck, upper and lower back; radiates throughout her lower extremities; and is a constant 10 on the 0-10 scale. *Id.* Dr. Shay noted King "walks with significant difficulty, and is found lying down on the examination table. She is assisted to [a] sitting position with much difficulty. . . . She has an abnormal gait and walks with difficulty secondary to severe paraspinal spasm and pain behavior." Tr. 957. Examination of the spine revealed "multiple areas of tenderness along the cervical, thoracic, and lumbar spine." *Id.* However, King exhibited full strength and range of motion in her extremities. *Id.* Dr. Shay assessed cervical and lumbar radiculopathy, and scheduled King for a trial epidural steroid injection the following week, to continue if the treatment was effective. *Id.*

## **FINDINGS**

King generally argues that the ALJ's RFC is not supported by substantial evidence. She specifically challenges the ALJ's RFC because it omits: (1) Dr. Sorenson's opinion on her exertional limitations; (2) improperly omits her need for a wheelchair, and

(3) improperly omits a mental limitation to "1-2 step instructions."  This court agrees that the ALJ erred in all three respects.

**I.    <u>Dr. Sorenson's Opinion</u>**

King argues that the ALJ erred by rejecting the RFC evaluations by the treating (Dr. Sorenson), examining (Dr. Vesali), and non-examining (Drs. Fraccia and Ikawa) physicians and instead formulating her own RFC that King was more limited than opined by Drs. Vesali, Fracchia, and Ikawa, but less limited than opined by Dr. Sorensen.  In essence, she challenges the ALJ's rejection of all of the medical opinions in favor of her own middle path.

Contrary to King's contention, an ALJ may reject a particular physician's proposed RFC in whole or in part and instead craft an RFC from various parts of the record.  *See* 20 CFR §§ 404.1546, 416.946 (the ALJ "is responsible for assessing" the claimant's RFC).  In addition, King's challenge to the ALJ's rejection of the opinions by the non-treating physicians is harmless.  Drs. Vesali, Fracchia, and Ikawa all concluded that King had fewer physical limitations than assigned by the ALJ and that she could perform medium work.  Such opinions were ultimately inconsequential because the ALJ found that King could only perform light work.  Tr. 16.  Because the ALJ's treatment of these opinions did not prejudice King's disability determination, any error in that regard was harmless.  *See Molina v. Astrue*, 674 F3d 1104, 1115 (9th Cir 2012) (citation omitted) (legal errors are harmless where they clearly did not alter the ALJ's decision or prejudice the claimant).

Instead, King's challenge is more properly considered as directed at the ALJ's rejection of Dr. Sorenson's two opinions in the Questionnaires dated December 28, 2010, and March 29, 2011.  Tr. 644-48, 665-69.  With respect to Dr. Sorenson's March 2011

13 - FINDINGS AND RECOMMENDATION

opinion that King could only do sedentary work and required use of a cane or other assistive device, the ALJ gave it "little weight" because the limitations were "overly restrictive" and "not consistent with the medical evidence." Tr. 19. Although the ALJ assigned "great weight" to Dr. Sorenson's earlier December 2010 opinion that King "could perform unskilled work," she did not discuss the rest of that opinion and presumably rejected it for the same reason as his similar March 2011 opinion.

Generally, a treating physician's opinion is afforded the greatest weight in disability cases because "the treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Ramirez v. Shalala*, 8 F3d 1449, 1453 (9th Cir 1993) (citations and internal quotation marks omitted). A treating physician's opinion on the nature and severity of the claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 CFR §§ 404.1527(c)(2), 416.927(c)(2). An uncontroverted treating or examining doctor's opinion may only be discredited for "clear and convincing reasons." *Thomas v. Barnhart*, 278 F3d 947, 957 (9th Cir 2002) (citation omitted). If it is contradicted by the opinion of another doctor, the ALJ may reject the treating or examining doctor's opinion by providing "specific and legitimate reasons" supported by substantial evidence in the record. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995) (citation omitted).

Similarly, the ALJ is "not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability" if the ALJ gives clear and convincing reasons for rejecting those opinions. *Reddick*, 157 F3d at 725, quoting *Matthews v. Shalala*, 10 F3d 678, 680 (9th Cir 1993). "A treating physician's opinion on disability, even if controverted,

14 - FINDINGS AND RECOMMENDATION

can be rejected only with specific and legitimate reasons supported by substantial evidence in the record.  In sum, reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion." *Id* (citation omitted).

The ALJ gave no reason to reject Dr. Sorenson's opinions other than stating that his limitations "are not consistent with the medical evidence of record." Tr. 19.  Although conceding that the ALJ could have more explicitly linked the inconsistent medical evidence to Dr. Sorenson's opinion, the Commissioner argues that the ALJ's review of the other medical evidence earlier in her decision contains those inconsistencies. The Commissioner is correct that some of the medical evidence summarized by the ALJ contradicts Dr. Sorenson's opinion.  However, by discounting those contradictory opinions of other physicians, the ALJ failed to provide any specific and legitimate reasons supported by substantial evidence in the record to reject Dr. Sorenson's opinions.

First, the ALJ noted that Dr. Vesali, an examining physician, opined in September 2009 that King "did not need to use an assistive device to walk" (Tr. 19, citing Tr. 836). This opinion was based on the observation that King had "no difficulty getting on or off the exam table," "taking shoes off or putting them back on," or "maneuvering in the exam room." Tr. 834.  As the ALJ noted, this "was a one-time examination" by a non-treating physician who, "[w]ithout having been familiar with [King's] medical history and having treated [her] over a long period of time," was "less able to accurately evaluate [her] long-term functional capacity." Tr. 19.  Although Dr. Vesali's opinion contradicts Dr. Sorenson's opinions, the ALJ rejected it.  Thus, Dr. Vesali's opinion cannot constitute substantial evidence to reject Dr. Sorenson's opinion.  Moreover, other evidence in the

record reveals that King's condition worsened after Dr. Vesali's examination and before the dates of Dr. Sorenson's opinions. By August 2011, nearly two years after Dr. Vesali's examination, Dr. Shay observed that King walked with "significant difficulty," suggesting that her ability to walk had materially changed. Tr. 957.

The ALJ also summarized the October 2009 opinion by Dr. Fracchia, a reviewing physician, that King could perform medium work which contradicts Dr. Sorenson's later opinions. Tr. 565-68. In December 2009, without making additional findings, Dr. Ikawa agreed with Dr. Fracchia's assessment and specifically reiterated that King "uses a walker, but it was not prescribed and it is not medically indicated." Tr. 599. However, the ALJ gave "little evidentiary weight to those opinions because the record now contains additional evidence that establishes [King's] impairments and resulting limitations were actually more severe than they might have appeared at that time." Tr. 18. As with Dr. Vesali's opinion, the rejected opinions of Drs. Fracchia and Ikawa, although contradictory, cannot constitute substantial evidence to reject Dr. Sorenson's opinion. Moreover, testimony from a non-examining physician ordinarily does not warrant rejection of a treating physician's opinion. *Pitzer v. Sullivan*, 908 F2d 502, 506 n4 (9th Cir 1990) ("The non-examining physicians' conclusion, with nothing more, does not constitute substantial evidence, particularly in view of the conflicting observations, opinions, and conclusions of an examining physician" (citation omitted)).

Merely referring to an unspecified inconsistency with the medical record is not a specific and legitimate reason supported by substantial evidence for the ALJ to discredit Dr. Sorenson's opinions.

///

## II.   __Assistive Walking Device__

King also argues the ALJ erred in omitting from the RFC her confinement to a wheelchair.  At the hearing, King testified that she had used a wheelchair for one or two years when she traveled outside the house and that the wheelchair, but not the walker, had been prescribed.  Tr. 17, 51, 54.

The ALJ found King's claimed need for an assistive walking device not credible because "it was not prescribed, and it is not medically indicated."  Tr. 18.  Inconsistencies in a claimant's testimony, including those between the medical evidence and the alleged symptoms, can serve as a clear and convincing reason for discrediting such testimony. *Burch v. Barnhart*, 400 F3d 676, 680 (9th Cir 2005).  However, Dr. Sorenson prescribed King with a wheelchair in 2009 (Tr. 445, 630) and again in 2010.  Tr. 651.  King accurately recounted the details of the Dr. Sorenson's 2010 referral to "the man that handles [the motorized wheelchairs], which is David or something."  Tr. 54, 651 ("call DAVE: motorized wheelchair; walker.").  King chose a non-motorized wheelchair due to a five-year waiting list for motorized chairs.  Tr. 54.  Based on this evidence, the ALJ could not rely on the lack of a prescription or medical diagnosis to discredit King's testimony about needing a wheelchair.

Neither could the ALJ rely on contradictory medical opinions to reject Dr. Sorenson's opinion that King needs a wheelchair.  As previously discussed, the ALJ rejected all medical opinions that King can walk independently.  In September 2009, King told Dr. Vesali she had relied on a walker that she borrowed from someone since February 2009.  Tr. 834.  However, Dr. Vesali observed King walk "slowly with the walker, with no particular abnormal gait" and had "no difficulty getting on or off the exam table," "taking

shoes off or putting them back on," or "maneuvering in the exam room." Tr. 834. As a result, Dr. Vesali opined that King did not "need to use an assistive device for ambulation." Tr. 836. Dr. Ikawa similarly opined that King "uses a walker, but it was not prescribed and it is not medically indicated." Tr. 599. However, as explained above, the ALJ rejected Dr. Vesali's opinion as "less accurate" and Dr. Ikawa's opinion because King's limitations "more severe that they might have appeared at the time". Tr. 18.

Although the ALJ erred in rejecting Dr. Sorenson's opinion regarding the need for an assistive device and King's testimony about using one, the record is unclear whether the worsening of King's condition after 2009 necessitated the use of an assistive device. Dr. Shay observed in August 2011 that King walked with "significant difficulty" and an "abnormal gait" without assistance. Tr. 957. But Dr. Shay does not note whether King was using an assistive device at that time and could either mean that King's condition worsened or could contradict Dr. Sorenson's opinion and King's testimony about needing an assistive device. Rather than addressing how Dr. Shay's observations bear on the other evidence, the ALJ simply rejected Dr. Sorenson's March 2011 opinion and discredited King's testimony. By doing so, the ALJ erred.

### III.    1-2 Step Instructions

Finally, King argues that the ALJ erred by failing to include a restriction to "1-2 step instructions" in her RFC and only limiting her to "simple routine tasks." Tr. 16. King contends that inclusion of the "1-2 step instruction" limitation would eliminate the jobs identified by the VE of ticket taker, cashier 2, and mail clerk, all of which require a Level Two Reasoning level or higher.

The Dictionary of Occupational Titles ("DOT") defines occupations in the national economy.  *See* DICTIONARY OF OCCUPATIONAL TITLES (4th ed. 1991), *available at* http://www.oalj.dol.gov/libdot.htm.  Each job description includes a "definition trailer," which identifies the skills required to perform each job.  *See id* at App. C, *available at* 1991 WL 645965 (explaining the components of "definition trailer").  The General Educational Development ("GED") component of the definition trailer includes three sections:  reasoning development, math development, and language development.  *Id.*  The "reasoning development level" uses a 1-6 scoring system to identify the required reasoning ability.  *Id.*

The Commissioner argues that the GED scores are irrelevant here because they do not reflect the actual ability to perform the job, but instead describe the education and skill background necessary to secure the job.  This court has previously rejected that argument.  *See, e.g.*, *Chase v. Colvin*, No. 06:12-cv-04857-HZ, 2013 WL 5567082, at **4-5 (D Or Oct. 9, 2013); *Ball v. Astrue*, No. 06:09-cv-00764-HU, 2010 WL 3420166, at *16 (D Or Aug. 27, 2010).  Contrary to the Commissioner's argument, "the issue of a job's simplicity, . . . appears to be . . . squarely addressed by the GED [reasoning level] ratings."  *Meissl v. Barnhart*, 403 F Supp2d 981, 983 (CD Cal 2005) (alteration in original).  In explaining the GED, the DOT states that it "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance."  *Chase*, 2013 WL 5567082, at *4; *see Ball*, 2010 WL 3420166, at *16 ("the reasoning level assigned to a job classification does in fact reflect the reasoning skills required for the worker to satisfactorily perform that particular job").

Next, the Commissioner argues that the omission of the "1-2 step instruction" limitation was harmless because the VE's testimony includes the restriction to "simple, routine tasks."

Although the Ninth Circuit has not yet addressed this issue, other circuit courts have found no conflict between Level Two Reasoning and an RFC limitation of simple, repetitive, or routine tasks. *See, e.g., Hackett v. Barnhart*, 395 F3d 1168, 1176 (10th Cir 2005) ("level-two reasoning appears more consistent with Plaintiff's RFC" limiting her to "simple and routine work tasks"); *Money v. Barnhart*, 91 Fed App'x 210, 215 (3rd Cir 2004) ("[w]orking at reasoning level 2 would not contradict the mandate that [plaintiff's] work be simple, routine and repetitive"). District courts in this circuit, including this court, have reached the same conclusion. *See, e.g., Gottschalk v. Colvin*, No: 6:13-cv-00125-JE, 2014 WL 1745000, at *6 (D Or May 1, 2014); *Meissl*, 403 F Supp2d at 983-85. Thus, if an ability to follow "1-2 step instructions" equates to "simple, routine tasks" that reflect a Level Two Reasoning, then King would be able to perform one of the jobs (ticket taker) identified by the VE.[3]

However, this court has found the "1-2 step instruction" limitation to be more restrictive than the limitation of "simple, routine tasks." *See Trujillo v. Colvin*, No. 3:13-CV-0620-SI, 2014 WL 2213218, at *5 (D Or May 27, 2014). More importantly, the limitation to follow *only* "one- or two-step instructions" is directly correlated to Level One Reasoning. Level Two Reasoning is defined as having the reasoning ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations." Dictionary of Occupational Titles, App. C, *available at* 1991 WL 688702. On the other hand, Level One Reasoning is defined as having the reasoning ability to "[a]pply commonsense

---

[3] Although she could not perform the remaining two jobs identified by the VE (cashier II and mail clerk) which require a Level Three Reasoning, that error would be harmless if substantial evidence supports the ALJ's finding that King could perform at least one job in the national economy. *See Rutherford v. Barnhart*, 399 F3d 546, 558 (3rd Cir 2005) (finding that inconsistencies between claimant's dexterity limitations and some of jobs of the identified by the VE were harmless if substantial evidence otherwise supported the ALJ's step five conclusions); *Hogansen v. Astrue*, No. 09-6240-CL, 2011 WL 1002106, at *12 (D Or Jan. 27, 2011) (the VE's identification of one job that claimant could perform was substantial evidence to support the ALJ's step five finding).

understanding to carry out simple one- or two-step instructions" and to "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.* As this court has recognized several times, the "correlation here could not be more exact." *Chase*, 2013 WL 5567082, *5; *Whitlock v. Astrue*, No. 3:10-CV-357-AC, 2011 WL 3793347, at *5 (D Or Aug. 24, 2011) (noting alignment between the language in the restriction and the phrasing in the level definition). Inclusion of the language of "one-or two-step instructions" is the distinction between Level One and Level Two Reasoning. *Trujillo v. Colvin*, No. 3:13-CV-0620-SI, 2014 WL 2213218, at *5 (D Or May 27, 2014); *see Grigsby v. Astrue*, No. EDCV 08-1413 AJW, 2010 WL 309013, at *2 (CD Cal Jan. 22, 2010) ("Level 2 reasoning jobs may be simple, but they are not limited to *one- or two-step instructions*.").

The record is unclear whether the ALJ's failure to omit this more restrictive limitation from King's RFC constitutes harmless error. The ALJ's treatment of the non-exertional assessments provides little clarity. In summarizing the RFC assessments of the reviewing physicians, the ALJ referred to Dr. Ikawa's opinion that King could only follow "procedures of a simple, routine nature involving one- or two-step job tasks and instructions." Tr. 18. Although the ALJ explicitly assigned "little weight" to the physical limitations assessed by the reviewing physicians, she neither accepted nor rejected the non-exertional limitations. In addition, the ALJ failed to explain what was meant by including "simple routine tasks" in the RFC or whether she distinguished between "simple, routine tasks" and "1-2 step instructions." Tr. 16. The ALJ gave "great weight" to Dr. Sorenson's opinion that King could perform "unskilled work," but gave "little weight" to his opinion that King was "incapable of even 'low-stress' jobs" and also rejected Dr. Libunao's opinion that King "did not have the ability to perform simple or detailed repetitive or complex tasks" or "accept instructions from supervisors." Tr. 19.

Although King's attorney asked the VE hypothetical questions that included the inability to "perform even simple and repetitive tasks," the VE was not asked how an additional limitation to "1-2 step instructions" would affect the availability of jobs.  Tr. 73-78.  Thus, it is unclear from the record whether the VE considered a distinction to exist between "simple, routine tasks" and the "1-2 step instruction" restriction or whether she would deviate from the DOT and include Level 2 Reasoning jobs in her answer regardless of further restrictions on King's non-exertional RFC.  The court cannot discern whether the omission of the "1-2 step instruction restriction" prejudiced King's disability determination based on the present record.

**IV.**   **Remand**

Remand for further proceedings is appropriate when "outstanding issues" remain. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).  The court may, but is not required to, "credit as true" rejected evidence prior to remand.  The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, "when, even if the evidence at issue is credited, there are 'outstanding issues that must be resolved before a proper disability determination can be made.'" *Id* at 1035, quoting *Vasquez v. Astrue*, 572 F3d 586, 593 (9th Cir 2009).

As discussed above, the ALJ erred in several respects.  Even if Dr. Ikawa's recommended "1-2 step instruction" limitation is credited, a remand is necessary for the reasons previously discussed.  It also is unclear whether Dr. Sorenson's testimony should be credited because it is largely based on King's testimony as to the severity of her symptoms that the ALJ discredited — a finding which King does not dispute.  Moreover, even if the court were to credit Dr. Sorenson's testimony about King's need for an assistive device, a question remains of which jobs King could perform with a walker or a wheelchair.

22 - FINDINGS AND RECOMMENDATION

Although the VE was asked how reliance on an assistive device would impact the jobs available to King, that question included all of the other limitations assessed by Dr. Sorenson.  Tr. 72-73.  Under these circumstances, a remand for further proceedings to correct the ALJ's errors is appropriate.

## RECOMMENDATION

For the reasons discussed above, the Commissioner's decision should be REVERSED and REMANDED for further proceedings pursuant to sentence four of 42 USC § 405(g).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due Monday, October 06, 2014.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED September 18, 2014.


s/ Janice M. Stewart
_____
Janice M. Stewart
United States Magistrate Judge